### In re PENN.
### No. 3011.

District Court, W. D. Oklahoma.
Sept. 23, 1929.

The following is the opinion of referee in bankruptcy:

### Statement of Facts.

On March 23, 1925, Augustus M. Penn filed his voluntary petition and schedules in bankruptcy, and upon the same day was duly adjudged bankrupt and the case referred under general order of reference to the undersigned referee for administration. On April 15, 1925, the first meeting of creditors was had, after due notice to the creditors scheduled which included C. H. Stratton, Pawhuska, Okl., a creditor hereinafter mentioned. No creditors appeared at said meeting, and the referee appointed a trustee with instructions to qualify promptly and with directions that if he found there were no assets subject to administration to so report, in which event after the entry of proper orders the case would be ordered closed without further meeting of creditors, as authorized by the then Rule No. 22, now Rule No. 18, of the Rules in Bankruptcy of this court. Thereafter the trustee made report on exemptions, and application to disclaim certain property as burdensome and worthless, and a report of no assets subject to administration, and orders were duly entered thereon and the case ordered closed on May 9, 1925, without further meeting of creditors.

On May 21, 1925, the bankrupt filed application for discharge, and on September 29, 1925, C. H. Stratton filed objections thereto. The bankrupt had listed in his schedule of assets "Osage Indian Headright, value unknown," and in the objections to discharge it was alleged that this was a knowing and fraudulent concealment of assets from the trustee, and alleged therein that the income of bankrupt from the Osage mineral interests was subject to administration herein. Thereafter, the said application for discharge and objections thereto were referred to the undersigned referee to take testimony and make report with findings of fact and recommendation.

On December 24, 1926, a petition was filed by O. A. Stratton, apparently the same person designated as C. H. Stratton in the objections to discharge, said petition asking that the orders closing the case be vacated and that the said Osage mineral interests of the bankrupt be administered herein, making his objections to the discharge a part of said application.

On February 1, 1927, the said application was referred to this referee to make report thereon with recommendations.

The facts as agreed upon herein are: that Augustus M. Penn, the bankrupt, is an adult allotted member of the Osage Tribe of Indians, enrolled as less than half blood; that there was allotted to him his proportionate share of the tribal land and set aside to him his proportionate share of the tribal funds and the proceeds derived from the sale of oil and gas and other minerals reserved to the Osage Tribe of Indians, subject, of course, to all the acts of Congress and regulations of the Department of the Interior applicable thereto; that since his adjudication as a bankrupt he has received in the neighborhood of probably $10,000 per annum which has not been turned to the trustee in bankruptcy, which moneys were derived from his portion of mineral interests reserved to said tribe, being the proceeds of the sale of oil and gas leases; that the bankrupt has no property other than his interest in said reserved mineral holdings, except his homestead; that prior to the filing of his petition in bankruptcy, the bankrupt had received from the Secretary of the Interior a certificate of competency as authorized by the Act of Congress of June 28, 1906 (34 Stat. 539). It appears further that the value of the bankrupt's interest in the reserved mineral rights is unknown.

### Conclusions of Law.

■ The argument submitted by the creditor is to me wholly unconvincing. It points out no specific provisions of the Osage Allotment Act or Acts amendatory thereof or supplemental thereto which have the effect of submitting the interest of bankrupt in the oil, gas, coal, and other minerals covered by the lands allotted to the Osages, to the claims of creditors or the jurisdiction of the bankruptcy court. He seeks to do this by inference, contrary to the rule which is found to prevail in decisions of the federal courts in Indian cases, that all possible inference shall be invoked in favor of the restrictions and government control, and guardianship, and that, where property has been held by the government in trust for the Indian or subject to restrictions against alienation, the release therefrom must be by legislation clear and unambiguous.

Further, the principal argument of the creditor is based upon the fact that the Indian bankrupt is a citizen of the United States and the state of Oklahoma, but this has no weight or bearing whatsoever upon the control of the government over Indian property. Brader v. James, 246 U. S. 88, 38 S. Ct. 285, 62 L. Ed. 591; Tiger v. Western Investment Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738; U. S. v. Pearson (D. C.) 231 F. 270 (cited in McCurdy v. U. S., 246 U. S. 265, 38 S. Ct. 289, 62 L. Ed. 706).

At the time of the passage of the Osage Allotment Act of June 28, 1906 (34 Stat. 539), Osage Indians were occupying as a tribe their reservation in Oklahoma Territory containing about one and a half million acres of land, largely underlaid with oil, gas, and other minerals. At the same time the government held in trust for said tribe, which consisted of about two thousand persons, a fund of over $8,000,000 received under various treaties as compensation for relinquishing other lands. The said act provided for the allotment of said reservation lands and in section 3 thereof reserved the oil, gas, coal, or other minerals to the Osage Tribe for a period of twenty-five years from and after the 8th day of April, 1906. Section 5 of said act designates the said mineral interests and funds, above referred to, as held in trust by the United States, etc. It also refers to certain lands held in trust, but these were apparently certain Indian villages and tracts withheld from allotment, and we are not herein concerned with them or said trust fund of over $8,000,000.

These mineral interests sought to be reached herein are, therefore, held by the government in trust for a period of 25 years from April 8, 1906, and by Act of March 3, 1921 (41 Stat. 1249), the time of such trust holding was extended to April 8, 1946. This act removed the restrictions on Indians of less than one-half Indian blood except as to funds held by the government belonging to the tribe and provided for the manner of payment of quarterly annuities to noncompetents and the payment to those having certificates of competency of their portion of the funds as it accumulated.

In my opinion, there is nothing in these acts, or in the other acts dealing with the Osages, which are cited in the briefs, that submits this mineral interest, or the fund derived therefrom, to the claims or reach of creditors prior to its unconditional release to the Indian. To do so would be contrary to public policy and contrary to the policy of our whole course of Indian legislation. I consider that such interest could not be either sold, assigned, or transferred by Penn, the Indian bankrupt, or be levied upon by execution, attachment, or garnishment, and

these are important tests of property which passes to a trustee in bankruptcy. Even the right, title, and interest of a person, *not an Indian by blood,* in such trust funds and mineral interests can be sold, assigned, and transferred only with the approval of the Secretary of the Interior and under such rules and regulations as he may prescribe, as is shown in the provisions quoted from the Act of April 12, 1924 (43 Stat. p. 94, c. 95), at page 5 of the bankrupt's brief.

Apparently at the time the petition in bankruptcy was filed herein, Penn had no funds on hand and had only his interest in the said reserved tribal mineral interests, held in trust by the government. It could not be sold, assigned, or transferred by Penn, and could not pass to Penn's trustee in bankruptcy, the trustee's rights being fixed and determined as of the date of the filing of said petition. Had there been funds derived from said mineral interests in Penn's hands, at the time the petition was filed, the trustee would have been entitled to them. Payments made to Penn subsequent to such time, which are those sought to be reached herein, fall in the same class as after-acquired property and the trustee has no interest therein.

The case of In re Russie (D. C.) 96 F. 609, 610, 3 Am. Bankr. Rep. 6, was an Indian bankruptcy case and contains principles which I consider so clearly applicable and so well stated that I will quote from it at some length. It states, in part:

"This property is excluded from the description of property given in subdivision 5 of section 70 of the bankruptcy act [11 USCA § 110], which describes as one of the classes of property to be taken by the trustee property which, prior to the filing of the petition, the bankrupt could by any means have transferred, or which might have been levied upon and sold under judicial process against him. This is not such property, and it is clearly the intention of congress that property should not pass to the trustee which could not be the subject of conveyance or disposition by the bankrupt at the time the bankruptcy proceedings were inaugurated. It is not the policy of the bankruptcy act to interfere with the acts of congress relating to the disposition and control of property set apart for the benefit of members of the Indian tribes. Obviously, the policy of congress is to preserve what may be termed 'Indian lands' intact, for the benefit of the individuals composing the tribe to whom allotments have been or may be made; and therefore the right of disposition by the Indian allottees upon these reservations is expressly withheld. If the Indian cannot dispose of these lands by deed, or by suffering an execution to be levied upon them under judicial process, he cannot dispose of them by the method of a petition in bankruptcy. The policy which preserves the land from disposition in the one case operates in the other; otherwise, the providence which the government exercises over these Indians will be defeated, and the industrial Indian community which has been set up on the reservation, with its adjuncts of an agricultural farm and school, will be intruded upon by white men, who will succeed to the Indian title and privileges through the operation of the bankruptcy law. It is argued that an Indian who voluntarily goes into bankruptcy should at least forfeit to his creditors the property interest which he holds under the allotment act. But the debts of such an Indian are not created upon the credit of the land allotted to him. The man who deals with such an Indian does so with knowledge of his disability to dispose of or incumber the land held under the allotment act. He expected nothing from this source, and has no reason to complain that he gets nothing. The decision of the referee, holding that the allotted lands in question are not liable for the bankrupt's debts, is affirmed."

In my opinion the trust holding by the government of the proceeds of the mineral interests would not end until actual release to Penn, and up to the time of such release Congress could repeal the provision therefor.

A case which, in my opinion, goes to far greater extent in upholding such government control over Indian property until actual unconditional delivery is U. S. v. Rowell, 243 U. S. 464, 37 S. Ct. 425, 427, 61 L. Ed. 848.

The following declaration therein concerning the direction by Congress to the Secretary of the Interior to issue a patent to Rowell seems equally applicable here. It is:

"At most, that direction was but an exertion of the administrative control of the government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect."

We will refer briefly to certain general principles and decisions having a bearing thereon.

There have been two general classes of Indian allotments in the United States, to wit: Those made under the general allotment Act of February 8, 1887 (24 Stat. 388), and the amendments thereto, and those made under special acts. Here in Oklahoma we have both classes; under the General Allot-

ment Act, the ·Poncas, Otoe, and Missouri, Cheyennes, Arapahos, Caddos, Comanches, Iowas, Sac and Foxes, Tonkawas, Kickapoos, Shawnees, etc.; under special acts, the Five Civilized Tribes, Osages, Kaws, etc. Under the general allotment act a preliminary or trust patent issued, the allotments to be held thereunder for 25 years unless the period were extended before a final or fee-simple patent issued. Under some of the special acts fee-simple title issued subject to restrictions on alienation. Under the Osage act we find fee-simple title issuing to allotments subject to restrictions on alienation, and at the same time certain lands, moneys, and mineral interests held in trust.

There does not appear to be any substantial difference in the principles announced by the courts, as to control by the government of property held in trust and that subject to restriction on alienation. As to trust property, see U. S. v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 536.

As to lands held subject to restrictions on alienation, see Tiger v. Western Investment Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738.

The same general principles as to government control apply to personalty as to realty. U. S. v. Rickert, supra; Tiger v. Western Investment Co., supra; U. S. v. Thurston County (C. C.) 143 F. 287; National Bank of Commerce v. Anderson (C. C. A.) 147 F. 89.

These are pioneer leading cases which have been reaffirmed and amplified from time to time.

I do not find anything in the following decision relating to the Osages, which is relied upon by the creditor, in conflict with my conclusions, but I consider it, as far as applicable, to support the same: McCurdy v. U. S. (1918) 246 U. S. 265, 38 S. Ct. 289, 291, 62 L. Ed. 706.

Among other things, it states:

"Even if the whole trust fund should be released and, despite supervision, improvidently spent, the legally competent allottee would still have his homestead and his share in valuable undivided oil, gas and coal rights; and the legally incompetent, his surplus lands in addition. * * * While an Indian is still a ward of the nation, there is power in Congress even to reimpose restrictions on property already freed."

The facts in the McCurdy Case, upon the point decided against the government, differ completely from those in the case at bar.

I therefore conclude and recommend that the objections to bankrupt's discharge should be denied and said discharge granted, and that said motion to vacate the orders closing the case should be denied.

Dated this 10th day of December, 1928, at Oklahoma City, Okl.

Isaac D. Taylor,
Referee in Bankruptcy.

J. M. Humphreys, Osage Tribal Attorney, of Pawhuska, Okl., for bankrupt.

Chas. A. Holden, of Tulsa, Okl., for creditor.

VAUGHT, District Judge.

On March 23, 1925, Augustus M. Penn filed his voluntary petition and schedules in bankruptcy, and upon the same date was duly adjudged bankrupt, and the case referred under general order of reference to the referee in bankruptcy for administration. On April 15, 1925, the first meeting of creditors was held after due notice to the creditors, including C. H. Stratton of Pawhuska, Okl., a creditor. No creditors appeared at said meeting, and the referee appointed a trustee with instructions to qualify promptly and with further instructions that if he found there were no assets subject to administration to so report. Thereafter, the trustee made report that there were no assets subject to administration, and under Rule No. 22, now Rule 18 of the Rules in Bankruptcy of this court, orders were duly entered showing that there were no assets and the case ordered closed on May 9, 1925, without further meeting of creditors.

On May 21, 1925, the bankrupt filed an application for discharge, and on September 29, 1925, C. H. Stratton, a creditor, filed objections thereto and in his objections to discharge alleged that the bankrupt knowingly and fraudulently concealed his assets from the trustee and alleged that the bankrupt's income from the Osage mineral interests were subject to administration herein. Thereafter, the court referred said application for discharge, and the objections thereto, to the referee to take testimony and make report of all findings of fact and recommendations. On December 10, 1928, Isaac D. Taylor, referee in bankruptcy at Oklahoma City, filed his report on the motion to vacate orders and reopen the case and upon the objections to discharge.

Thereupon, the referee filed his report recommending that the motion to vacate the orders and reopen the case be overruled, and that the objections to the discharge be over-

ruled. Thereafter, the creditor, C. H. Stratton, filed his exceptions to the referee's conclusions and report, and this matter comes on for hearing on the report of the referee and the exceptions thereto.

I have carefully examined the report of the referee, and the only question involved in this case is whether or not the rights or the bankrupt as an Osage Indian in this allotted share of the tribal land and his proportionate share of the tribal funds and the proceeds derived from the sale of oil and gas, and other minerals reserved to the Osage Tribe of Indians as restricted by the acts of Congress and the regulations of the Department of the Interior, are subject to execution, and are proper matters to be set up as assets in a bankruptcy proceeding.

I fully agree with the conclusions reached by the referee and feel that this matter has been fully determined by the Supreme Court of the United States.

It is therefore ordered that the exceptions to the referee's report be and the same are hereby overruled, and that the report of the referee be and the same is hereby in all matters approved and made the judgment of this court, to which an exception is allowed.